# EXHIBIT 1



## The University of the State of New York

**The State Education Department**
State Review Officer
www.sro.nysed.gov

No. 24-237

**Application of a STUDENT WITH A DISABILITY, by her parents, for review of a determination of a hearing officer relating to the provision of educational services by the New York City Department of Education.**

**Appearances:**
Brain Injury Rights Group, Ltd., attorneys for petitioners, by Erik Paul Seidel, Esq.

Liz Vladeck, General Counsel, attorneys for respondent, by Thomas W. MacLeod, Esq.

### DECISION

### I. Introduction

This proceeding arises under the Individuals with Disabilities Education Act (IDEA) (20 U.S.C. §§ 1400-1482) and Article 89 of the New York State Education Law. Petitioners (the parents) appeal from a decision of an impartial hearing officer (IHO) which denied their request that respondent (the district) fully fund the costs of their daughter's private nursing and transportation services delivered while she was unilaterally enrolled at the International Academy for the Brain (iBrain) for the 2023-24 school year. The district cross-appeals from that portion of the IHO's decision which awarded the full cost of the student's tuition at iBrain. The appeal must be dismissed. The cross-appeal must be dismissed.

### II. Overview—Administrative Procedures

When a student in New York is eligible for special education services, the IDEA calls for the creation of an individualized education program (IEP), which is delegated to a local Committee on Special Education (CSE) that includes, but is not limited to, parents, teachers, a school psychologist, and a district representative (Educ. Law § 4402; see 20 U.S.C. § 1414[d][1][A]-[B]; 34 CFR 300.320, 300.321; 8 NYCRR 200.3, 200.4[d][2]). If disputes occur between parents and school districts, incorporated among the procedural protections is the opportunity to engage in mediation, present State complaints, and initiate an impartial due process hearing (20 U.S.C.

§§ 1221e-3, 1415[e]-[f]; Educ. Law § 4404[1]; 34 CFR 300.151-300.152, 300.506, 300.511; 8 NYCRR 200.5[h]-[*l*]).

New York State has implemented a two-tiered system of administrative review to address disputed matters between parents and school districts regarding "any matter relating to the identification, evaluation or educational placement of a student with a disability, or a student suspected of having a disability, or the provision of a free appropriate public education to such student" (8 NYCRR 200.5[i][1]; see 20 U.S.C. § 1415[b][6]-[7]; 34 CFR 300.503[a][1]-[2], 300.507[a][1]). First, after an opportunity to engage in a resolution process, the parties appear at an impartial hearing conducted at the local level before an IHO (Educ. Law § 4404[1][a]; 8 NYCRR 200.5[j]). An IHO typically conducts a trial-type hearing regarding the matters in dispute in which the parties have the right to be accompanied and advised by counsel and certain other individuals with special knowledge or training; present evidence and confront, cross-examine, and compel the attendance of witnesses; prohibit the introduction of any evidence at the hearing that has not been disclosed five business days before the hearing; and obtain a verbatim record of the proceeding (20 U.S.C. § 1415[f][2][A], [h][1]-[3]; 34 CFR 300.512[a][1]-[4]; 8 NYCRR 200.5[j][3][v], [vii], [xii]). The IHO must render and transmit a final written decision in the matter to the parties not later than 45 days after the expiration period or adjusted period for the resolution process (34 CFR 300.510[b][2], [c], 300.515[a]; 8 NYCRR 200.5[j][5]). A party may seek a specific extension of time of the 45-day timeline, which the IHO may grant in accordance with State and federal regulations (34 CFR 300.515[c]; 8 NYCRR 200.5[j][5]). The decision of the IHO is binding upon both parties unless appealed (Educ. Law § 4404[1]).

A party aggrieved by the decision of an IHO may subsequently appeal to a State Review Officer (SRO) (Educ. Law § 4404[2]; see 20 U.S.C. § 1415[g][1]; 34 CFR 300.514[b][1]; 8 NYCRR 200.5[k]). The appealing party or parties must identify the findings, conclusions, and orders of the IHO with which they disagree and indicate the relief that they would like the SRO to grant (8 NYCRR 279.4). The opposing party is entitled to respond to an appeal or cross-appeal in an answer (8 NYCRR 279.5). The SRO conducts an impartial review of the IHO's findings, conclusions, and decision and is required to examine the entire hearing record; ensure that the procedures at the hearing were consistent with the requirements of due process; seek additional evidence if necessary; and render an independent decision based upon the hearing record (34 CFR 300.514[b][2]; 8 NYCRR 279.12[a]). The SRO must ensure that a final decision is reached in the review and that a copy of the decision is mailed to each of the parties not later than 30 days after the receipt of a request for a review, except that a party may seek a specific extension of time of the 30-day timeline, which the SRO may grant in accordance with State and federal regulations (34 CFR 300.515[b], [c]; 8 NYCRR 200.5[k][2]).

### III. Facts and Procedural History

The parties' familiarity with this matter is presumed and, therefore, the facts and procedural history of the case and the IHO's decision will not be recited in detail.

The district created an IEP for the student on April 20, 2023, with an implementation date of May 1, 2023, finding the student was eligible for special education services as student with a

2

traumatic brain injury (Parent Ex. B at pp. 1, 39, 41).[1]  The CSE recommended the student attend a 12-month 12:1+(3:1) special class in a district specialized school and receive adapted physical education three times per week (id. at pp. 35-36).  The CSE further recommended that the student receive five 60-minute sessions of individual occupational therapy (OT) per week, five 60-minute sessions of individual physical therapy (PT) per week, five 60-minute sessions of individual speech-language therapy per week, three 60-minute sessions of individual vision education services per week, and individual school nursing services as needed and recommended that the parents be provided one 60-minute session of parent counseling and training per month (id. at p. 35).  Further, the CSE recommended the support of individual full-time daily health paraprofessional services for ambulation, safety, and feeding and two 60-minute sessions of individual assistive technology services per week (id. at p. 36).  The CSE also recommended that the student be provided special transportation services consisting of transportation from the closest safe curb location to school, 1:1 paraprofessional services, a lift bus, and a regular wheelchair (id. at p. 39).

iBrain also created an education plan for the student, dated April 20, 2023, for the 2023-24 school year (Parent Ex. C at p. 1).  iBrain recommended that the student receive a 12-month program in a 6:1+1 special class with the support of 1:1 nursing services and 1:1 paraprofessional services (id. at pp. 55-57).  iBrain recommended specialized transportation of busing with adult supervision by a nurse, air conditioning, a lift bus/wheelchair ramp, a wheelchair, and limited travel time of no more than 90 minutes (id. at p. 57).  For related services, iBrain recommended that the student receive five 60-minute sessions of individual OT per week, five 60-minute sessions of individual PT per week, five 60-minute sessions of individual speech-language therapy per week, two 60-minute sessions of individual music therapy per week, one 60-minute session of group music therapy per week, two 60-minute sessions of individual assistive technology per week, and three 60-minute sessions of individual vision education services per week, and that the parents be provided with one 60-minute session of group parent counseling and training per month (id. at pp. 57-58).

In a letter dated June 20, 2023, the parents notified the district of their intent to unilaterally place the student at iBrain for 2023-24 school year as they disagreed with the proposed IEP and had not yet received either a prior written notice or school location letter (see Parent Ex. D).

The hearing record includes forms completed by the student's treating physician dated June 21, 2023, which indicated that the student was medically unstable during transport and needed to be monitored for prolonged seizure activity (Parent Ex. P at p. 5).  One of the included forms indicated that the student's primary diagnoses were a seizure disorder and cerebral palsy and that the reason for requesting 1:1 nursing services was that the student was "non-verbal" (id. at p. 9).

A contract for the student's enrollment at iBrain for the 2023-24 school year was signed on June 27, 2023 by the parent and on July 1, 2023 by a representative of iBrain (see Parent Ex. E).  The contract indicated that the student's base tuition was $190,000, which included academic programming as well as individual paraprofessional services and school nurse services, and

---

[1] The student's eligibility for special education as a student with a traumatic brain injury is not in dispute (see 34 CFR 300.8[c][12]; 8 NYCRR 200.1[zz][12]).

supplemental tuition was $119,160 in addition to the base tuition, which included related services (id. at pp. 1-2). The contract indicated that the tuition did not include transportation or individual nursing services (id.).

The hearing record includes an undated agreement between the parents and Sisters Travel and Transportation Services (Sisters Travel), which indicated Sister Travel would provide the student with school transportation services (see Parent Ex. F). The agreement indicated that the services were for the 12-month school year, which was approximately 218 school days (id. at p. 1). The agreement further indicated that transportation services would be billed at an annual rate of $166,770 and that services included a vehicle with air conditioning, regular-size wheelchair accessibility, and sitting space to accommodate a person to travel with the student as needed (id. at p. 2).[2]

An undated agreement between the parents and B&H Health Care, Inc. (B&H) indicates that the parents contracted with B&H for delivery of individual nursing services to the student for the 2023-24 school year from July 5, 2023 through June 21, 2024 (Parent Ex. G).[3] The agreement further indicated that the cost for nursing services would be billed at an annual rate of $292,556 (id. at pp. 1-2).

The district sent the parent a prior written notice, dated September 21, 2023, identifying the program and services recommended by the April 2023 CSE and a school location letter bearing the same date (see Parent Ex. H).

The student attended iBrain for the 2023-24 school year (see Parent Exs. M-O).

**A. Due Process Complaint Notice**

In a due process complaint notice, dated December 6, 2023, the parents alleged that the district procedurally and substantively denied the student a free appropriate public education (FAPE) for the 2023-24 school year (see Parent Ex. A).[4] The parents argued that the district's recommendation for placement of the student in a 12:1:3+1 special class was not appropriate because the class size was too large for the student and further asserted that the district failed to recommend 1:1 nursing services for the student (id. at pp. 5, 7). The parents also contended that

---

[2] The agreement indicated that should the student need additional equipment, the vehicle could accommodate it (Parent Ex. F at p. 2).

[3] The agreement included the provision of 1:1 private duty nursing services and 1:1 nursing services for transportation (Parent Ex. G at pp. 1-2).

[4] The parents requested pendency services pursuant to a July 31, 2023 SRO decision, Application of a Student with a Disability, Appeal No. 23-102, in which an SRO found that the district denied the student a FAPE for the 2020-21, 2021-22, and 2022-23 school years, that iBrain was appropriate for all three school years, and that equitable considerations supported the parents; the SRO ordered direct funding of the costs of the student's tuition and related services at iBrain for the 2021-22 and 2022-23 school years and funding for special transportation for the 2022-23 school year (Parent Ex. A at p. 2; see Application of a Student with a Disability, Appeal No. 23-102). The parents asserted that the student's placement includes tuition and supplemental services, transportation services, and nursing services (Parent Ex. A at p. 2).

4

the district failed to recommend music therapy and indicated that any music therapy provided at the recommended district 75 placement would not have been provided by a licensed therapist (id. at pp. 5-7). Moreover, the parents asserted that the district failed to timely notify the parents of its recommendations as the prior written notice and school location letter were both sent to the parents on September 21, 2023, well after the start of the extended school year (id. at p. 6). Additionally, the parents contended that the district failed to recommend appropriate special transportation such as a 1:1 travel nurse, denied them meaningful participation in the IEP process, and predetermined the recommendations contained in the student's IEP (id. at pp. 7-8).

For relief, the parents requested: an interim order on pendency; an order for the district to directly fund both full and supplemental tuition at iBrain for the 2023-24 extend school year; an order directing the district to fund special transportation services with limited travel, a 1:1 nurse and/or paraprofessional, air conditioning, a lift bus, and a regular sized wheelchair; an order compelling the district to evaluate the student and provide assistive technology services and devices to the student; an order directing the district to fund an independent psychological, neuropsychological, and educational needs assessment; and an order directing the district to reconvene the CSE (Parent Ex. A at pp. 8-9).

### B. Impartial Hearing Officer Decision

An impartial hearing convened before the Office of Administrative Trials and Hearings (OATH) on January 9, 2024 and concluded on March 8, 2024, after six days of proceedings (see Tr. pp. 1-315). In a decision dated May 2, 2024, the IHO found that the district denied the student a FAPE for the 2023-24 school year and that iBrain was an appropriate unilateral placement (IHO Decision at pp. 9-16).[5] However, the IHO found that equitable considerations did not fully favor the parent (id. at p. 16).

Regarding tuition, the IHO found that the parents were entitled to direct funding for the total amount of $309,160 for the student's base tuition and supplemental tuition at iBrain for the 2023-24 school year, pursuant to the enrollment contract as the parents agreed to pay that amount and the parents provided the required notice to the district (IHO Decision at pp. 16-17). However, the IHO held, based on equitable considerations, that the parents were not entitled to full funding for the private transportation services or the private nursing services, reducing funding for transportation by 50% and fully denying the request for funding for nursing services (id. at p. 17).

Regarding equitable considerations related to transportation and nursing services, the IHO found that the district was entitled to an adverse inference due to the parents' failure to provide a response to the subpoena for iBrain's "internal manual regarding how they discuss nursing and transportation services with families" (IHO Decision at p. 17). Although the IHO agreed with the parents that they did not have control over the private service providers, the IHO noted that the information requested about the providing agencies was "uniquely" in the parents' possession (id. at pp. 17-18). The IHO found that the parents failed to provide complete information regarding

---

[5] The IHO noted that during the hearing both parties agreed that there was no issue to address regarding pendency (IHO Decision at p. 4; however, the district changed this position and asserted that the prior SRO decision for this student could not serve as the basis for pendency because it was being appealed by the parents and the district opposed the parents' request for pendency (see Tr. pp. 24-27; IHO Exs. I; II).

5

the relationship between iBrain and the transportation and nursing providers, the parents chose not to present any evidence or witnesses from those agencies, and the parents failed to provide a witness from iBrain who was familiar with the providers and how parents were made aware of their services, and the parents' testimony did not include any specific knowledge of how the parents found the transportation and nursing providers (id. at pp. 17-18).[6] The IHO noted that the iBrain witness testified that she was "aware of a standard operating procedures manual maintained" by iBrain and that the "manual generally outlines what parents are told about" transportation and nursing services (id. at p. 18). The parents objected to the district's subpoena of that document, asserting that only the contract was relevant; however, the IHO was not persuaded by the parents' argument, finding that the relationship between iBrain and the agencies was relevant to the issue of equites (id.). The IHO determined that there was evidence in the hearing record of a relationship between iBrain and the providers of transportation and nursing services, as the parent testified he communicated with the agencies through iBrain and he received information about transportation from iBrain and the iBrain deputy director testified that issues regarding these services were discussed with the parents during the iBrain enrollment process (id.). The IHO held that the information regarding what iBrain told the parents about these agencies was "uniquely in [the] Parents' possession," and they failed to disclose it, an adverse inference was appropriate (id. at pp. 18-19).

Turning to the transportation contract, the IHO noted that she gave little to no weight to the transportation contract itself (IHO Decision at p. 20). Although, it was undisputed that the student required special transportation services, the IHO found that the parents' testimony regarding the contract was unreliable and again noted that the parents failed to provide relevant evidence or testimony regarding the relationship with iBrain and the transportation provider (id.). The IHO noted that the contract was undated and signed electronically without a digital stamp or evidence of who signed the document (id.). The IHO found that the parent's testimony on cross-examination was not forthcoming and that the parent did not sign the transportation contract (id.). The IHO noted the parent's "complete lack of memory regarding any other details of the contract and how they came to 'sign' the document" (id.). The IHO noted that the parent testified that someone from iBrain provided the parents with the transportation contract; however, the IHO found that the parent contradicted this testimony when he later testified that the contracts were negotiated with the respective companies (id. at pp. 20-21). Overall, the IHO held that the parent failed to "recall salient facts and provided conflicting testimony" (id. at pp. 21-22). Based on these findings, the IHO gave no weight to the parent's testimony about both the transportation and nursing agreements and again noted that the subpoenaed document would have provided relevant evidence, drawing a negative inference for the parents' failure to provide this information (id. at p. 22). The IHO reduced the requested relief for transportation services by 50%, awarding $83,385 for the 2023-24 extended school year (id.).

As for the nursing services, the IHO determined that equitable considerations did not favor the parents and barred the request for funding in its entirety (IHO Decision at p. 22). The IHO noted that the first reason for barring the requested relief was the lack of credible evidence and testimony, along with the adverse inference drawn from the parents' failure to provide information

---

[6] The IHO noted that it appeared the parent who did not testify had knowledge of this matter, but the parents chose not to call that parent as a witness (IHO Decision at p. 18 n. 7).

regarding iBrain and the provider agency (id.). The IHO questioned how the deputy director of the private school could testify about the student's need for 1:1 nursing services without being able to provide any information as to how the parents would obtain the service (id. at p. 23). The IHO reiterated her findings that the parent was not credible and found that the parent's witnesses were "less than forthright with their testimony regarding [the] Student's Nursing Contract" and that the deputy director was unable to provide any information about what the parents were told about nursing services (id.).

In addition to above rationale for denying funding for nursing services, the IHO also held that 1:1 nursing services were excessive, which would also bar funding (IHO Decision at p. 23). The IHO found that the hearing record lacked any specific information about how nursing services differed from the student's 1:1 health paraprofessional and why the student required 1:1 nursing services when already receiving the support of a 1:1 health paraprofessional (id. at p. 24). The IHO found that as neither the parent nor the deputy director were credible, they did not provide evidence to substantiate the need for 1:1 nursing services (id.). The IHO found that the parent's testimony contradicted the testimony of the deputy director regarding what the 1:1 nurse did for the student (id. at pp. 24-25). The IHO noted that the annual goals on the iBrain IEP indicated that the paraprofessional was to monitor the student's seizures, which the IHO found contradicted the deputy director's testimony (id. at p. 25). Moreover, the IHO found that there was no evidence to establish when and how the student received 1:1 nursing services (id.). The IHO found that the evidence did not support a finding that the student required 1:1 nursing services in addition to the support of a 1:1 health paraprofessional (id. at p. 26).

Turning to the request for independent evaluations, the IHO found that the parents did not provide any evidence or testimony regarding their request for an independent educational evaluation (IEE) and besides the district's mention of it during the opening statement, there was no mention of it in the hearing record (IHO Decision at p. 27). The IHO also held that the parents first requested an IEE in the due process complaint notice and, accordingly, the IHO denied the request for an IEE (id.). Lastly, the IHO found that iBrain was not the student's placement for pendency and denied the request to fund services through pendency (IHO Decision at pp. 29-34).

As relief, the IHO ordered the district to pay, directly to iBrain, $309,160 for the costs of the student's attendance at iBrain for the 2023-24 extended school year and to pay, directly to Sisters Transportation, 50 percent of the amount owed by the parents for transportation services for the 2023-24 extended school year (IHO Decision at p. 35).

**IV. Appeal for State-Level Review**

The parents appeal. The parents argue that the IHO erred by not awarding the full cost of transportation services pursuant to the transportation contract. The parents contend that there is no evidence in the hearing record as to the cost for transportation services, other than the contract, and there is no evidence that the contracted for costs were unreasonable. According to the parents, if the IHO believed the hearing record was inadequate, it was the IHO's responsibility to develop it as the IHO's decision must be based on objective evidence. The parents assert that the IHO had "no authority to modify the contract or question the reasonableness of [it]." The parents assert that they objected to a negative inference because they had no control over iBrain and the IHO "created her own standard and improperly shifted the burden to Parents to apparently prove that there was

7

no relationship between iBRAIN and the related services providers." The parents contend that the IHO, in part, based her denial of funding on the "improper negative inference." The parents assert that they provided testimony as to the contracts and there was no evidence that if the providers were recommended by iBrain that was unreasonable or would warrant a reduction.

The parents also appeal from the IHO's denial of funding for nursing services arguing that the IHO erred and should have awarded funding pursuant to the terms of the contract. The parents focus this portion of their appeal on a contention that the hearing record demonstrated that 1:1 nursing services were necessary for the student.

The parents note that they are not appealing the IHO's finding that the district failed to offer the student a FAPE, that iBrain was appropriate, or that equitable considerations with respect to funding for the iBrain tuition favored the parents.[7]

The district cross-appeals. The district argues that equitable considerations warrant a reduction of iBrain tuition, asserting that the cost of the tuition is unreasonable. The district contends that the hearing record lacks information regarding the student actually attending school on any given day. Further, the district asserts that since at least half of the student's day is for related services, which are separately billed, the base tuition of $190,000 is exorbitant and should be reduced by 50 percent.

As for the IHO's determinations reducing transportation services and barring funding for nursing services, the district asserts that the IHO's decisions should be upheld. The district asserts that the IHO was fully justified to reduce relief under equitable considerations.

In an answer to the cross-appeal, the parents argue that the district's request for a reduction in iBrain's tuition is not warranted. The parents contend that the district did not present any evidence or witnesses to support the claim that the tuition was not reasonable.

**V. Applicable Standards**

Two purposes of the IDEA (20 U.S.C. §§ 1400-1482) are (1) to ensure that students with disabilities have available to them a FAPE that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living; and (2) to ensure that the rights of students with disabilities and parents of such students are protected (20 U.S.C. § 1400[d][1][A]-[B]; see generally Forest Grove Sch. Dist. v. T.A., 557 U.S. 230, 239 [2009]; Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 206-07 [1982]).

A FAPE is offered to a student when (a) the board of education complies with the procedural requirements set forth in the IDEA, and (b) the IEP developed by its CSE through the IDEA's procedures is reasonably calculated to enable the student to receive educational benefits (Rowley, 458 U.S. at 206-07; T.M. v. Cornwall Cent. Sch. Dist., 752 F.3d 145, 151, 160 [2d Cir. 2014]; R.E. v. New York City Dep't of Educ., 694 F.3d 167, 189-90 [2d Cir. 2012]; M.H. v. New York City Dep't of Educ., 685 F.3d 217, 245 [2d Cir. 2012]; Cerra v. Pawling Cent. Sch. Dist.,

---

[7] The parents also did not appeal the IHO's pendency determination or the denial of their request for an IEE.

8

427 F.3d 186, 192 [2d Cir. 2005]). "'[A]dequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP'" (Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 129 [2d Cir. 1998], quoting Rowley, 458 U.S. at 206; see T.P. v. Mamaroneck Union Free Sch. Dist., 554 F.3d 247, 253 [2d Cir. 2009]). The Supreme Court has indicated that "[t]he IEP must aim to enable the child to make progress. After all, the essential function of an IEP is to set out a plan for pursuing academic and functional advancement" (Endrew F. v. Douglas Cty. Sch. Dist. RE-1, 580 U.S. 386, 399 [2017]). While the Second Circuit has emphasized that school districts must comply with the checklist of procedures for developing a student's IEP and indicated that "[m]ultiple procedural violations may cumulatively result in the denial of a FAPE even if the violations considered individually do not" (R.E., 694 F.3d at 190-91), the Court has also explained that not all procedural errors render an IEP legally inadequate under the IDEA (M.H., 685 F.3d at 245; A.C. v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist., 553 F.3d 165, 172 [2d Cir. 2009]; Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 381 [2d Cir. 2003]). Under the IDEA, if procedural violations are alleged, an administrative officer may find that a student did not receive a FAPE only if the procedural inadequacies (a) impeded the student's right to a FAPE, (b) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to the student, or (c) caused a deprivation of educational benefits (20 U.S.C. § 1415[f][3][E][ii]; 34 CFR 300.513[a][2]; 8 NYCRR 200.5[j][4][ii]; Winkelman v. Parma City Sch. Dist., 550 U.S. 516, 525-26 [2007]; R.E., 694 F.3d at 190; M.H., 685 F.3d at 245).

The IDEA directs that, in general, an IHO's decision must be made on substantive grounds based on a determination of whether the student received a FAPE (20 U.S.C. § 1415[f][3][E][i]). A school district offers a FAPE "by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction" (Rowley, 458 U.S. at 203). However, the "IDEA does not itself articulate any specific level of educational benefits that must be provided through an IEP" (Walczak, 142 F.3d at 130; see Rowley, 458 U.S. at 189). "The adequacy of a given IEP turns on the unique circumstances of the child for whom it was created" (Endrew F., 580 U.S. at 404). The statute ensures an "appropriate" education, "not one that provides everything that might be thought desirable by loving parents" (Walczak, 142 F.3d at 132, quoting Tucker v. Bay Shore Union Free Sch. Dist., 873 F.2d 563, 567 [2d Cir. 1989] [citations omitted]; see Grim, 346 F.3d at 379). Additionally, school districts are not required to "maximize" the potential of students with disabilities (Rowley, 458 U.S. at 189, 199; Grim, 346 F.3d at 379; Walczak, 142 F.3d at 132). Nonetheless, a school district must provide "an IEP that is 'likely to produce progress, not regression,' and . . . affords the student with an opportunity greater than mere 'trivial advancement'" (Cerra, 427 F.3d at 195, quoting Walczak, 142 F.3d at 130 [citations omitted]; see T.P., 554 F.3d at 254; P. v. Newington Bd. of Educ., 546 F.3d 111, 118-19 [2d Cir. 2008]). The IEP must be "reasonably calculated to provide some 'meaningful' benefit" (Mrs. B. v. Milford Bd. of Educ., 103 F.3d 1114, 1120 [2d Cir. 1997]; see Endrew F., 580 U.S. at 403 [holding that the IDEA "requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances"]; Rowley, 458 U.S. at 192). The student's recommended program must also be provided in the least restrictive environment (LRE) (20 U.S.C. § 1412[a][5][A]; 34 CFR 300.114[a][2][i], 300.116[a][2]; 8 NYCRR 200.1[cc], 200.6[a][1]; see Newington, 546 F.3d at 114; Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 108 [2d Cir. 2007]; Walczak, 142 F.3d at 132).

9

An appropriate educational program begins with an IEP that includes a statement of the student's present levels of academic achievement and functional performance (see 34 CFR 300.320[a][1]; 8 NYCRR 200.4[d][2][i]), establishes annual goals designed to meet the student's needs resulting from the student's disability and enable him or her to make progress in the general education curriculum (see 34 CFR 300.320[a][2][i], [2][i][A]; 8 NYCRR 200.4[d][2][iii]), and provides for the use of appropriate special education services (see 34 CFR 300.320[a][4]; 8 NYCRR 200.4[d][2][v]).[8]

A board of education may be required to reimburse parents for their expenditures for private educational services obtained for a student by his or her parents, if the services offered by the board of education were inadequate or inappropriate, the services selected by the parents were appropriate, and equitable considerations support the parents' claim (Florence County Sch. Dist. Four v. Carter, 510 U.S. 7 [1993]; Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359, 369-70 [1985]; R.E., 694 F.3d at 184-85; T.P., 554 F.3d at 252).  In Burlington, the Court found that Congress intended retroactive reimbursement to parents by school officials as an available remedy in a proper case under the IDEA (471 U.S. at 370-71; see Gagliardo, 489 F.3d at 111; Cerra, 427 F.3d at 192).  "Reimbursement merely requires [a district] to belatedly pay expenses that it should have paid all along and would have borne in the first instance" had it offered the student a FAPE (Burlington, 471 U.S. at 370-71; see 20 U.S.C. § 1412[a][10][C][ii]; 34 CFR 300.148).

The burden of proof is on the school district during an impartial hearing, except that a parent seeking tuition reimbursement for a unilateral placement has the burden of proof regarding the appropriateness of such placement (Educ. Law § 4404[1][c]; see R.E., 694 F.3d at 184-85).

## VI. Discussion

Initially, it is noted that neither party appealed the IHO's findings that the district failed to offer the student a FAPE, that iBrain was an appropriate unilateral placement, that the parents were not entitled to payment for iBrain pursuant to pendency, and that the parents were not entitled to an IEE (IHO Decision at pp. 9-16, 27-28, 29-34; see Req. for Rev.; see also Dist. Answer with Cross Appeal).  Accordingly, these findings have become final and binding on the parties and will not be reviewed on appeal (34 CFR 300.514[a]; 8 NYCRR 200.5[j][5][v]; see M.Z. v. New York City Dep't of Educ., 2013 WL 1314992, at *6-*7, *10 [S.D.N.Y. Mar. 21, 2013]).

Further, the district's cross-appeal asserting that the IHO should have reduced the base tuition does not provide a sufficient basis to disturb the IHO's finding.  During the hearing, the district did not present any evidence that the cost of the student's tuition at iBrain was unreasonable, other than pointing to the student's attendance and the fact that related services were billed separately.  Both of those arguments were made in the district's closing statement and were addressed by the IHO in her decision (see IHO Ex. IV at pp. 12-13, 16-17; IHO Decision at pp. 14-17).  It is worth noting that the IHO specifically determined that the evidence in the hearing

---

[8] The Supreme Court has stated that even if it is unreasonable to expect a student to attend a regular education setting and achieve on grade level, the educational program set forth in the student's IEP "must be appropriately ambitious in light of his [or her] circumstances, just as advancement from grade to grade is appropriately ambitious for most children in the regular classroom.  The goals may differ, but every child should have the chance to meet challenging objectives" (Endrew F., 580 U.S. at 402).

10

record supported finding that the student attended iBrain during the school year at issue, and the district has not cited to any evidence in the hearing record to refute this factual finding.[9] Additionally, while the district asserts that the cost of tuition at iBrain is excessive, the district presented no evidence during the hearing in support of this allegation—it would certainly have been reasonable for the district to question the costs of having a separate related services program on top of the student's base program. However, the district was required to come forward with evidence as to what a reasonable rate for each of those programs would have been or sufficient evidence to show that the parent's selection of the educational program provided to the student at iBrain was not reasonable. As such, I decline to disturb the IHO's findings regarding funding for the student's base and supplemental tuition at iBrain.

### A. Equitable Considerations

The final criterion for a reimbursement award is that the parents' claim must be supported by equitable considerations. Equitable considerations are relevant to fashioning relief under the IDEA (Burlington, 471 U.S. at 374; R.E., 694 F.3d at 185, 194; M.C. v. Voluntown Bd. of Educ., 226 F.3d 60, 68 [2d Cir. 2000]; see Carter, 510 U.S. at 16 ["Courts fashioning discretionary equitable relief under IDEA must consider all relevant factors, including the appropriate and reasonable level of reimbursement that should be required. Total reimbursement will not be appropriate if the court determines that the cost of the private education was unreasonable"]; L.K. v. New York City Dep't of Educ., 674 Fed. App'x 100, 101 [2d Cir. Jan. 19, 2017]). With respect to equitable considerations, the IDEA also provides that reimbursement may be reduced or denied when parents fail to raise the appropriateness of an IEP in a timely manner, fail to make their child available for evaluation by the district, or upon a finding of unreasonableness with respect to the actions taken by the parents (20 U.S.C. § 1412[a][10][C][iii]; 34 CFR 300.148[d]; E.M. v. New York City Dep't of Educ., 758 F.3d 442, 461 [2d Cir. 2014] [identifying factors relevant to equitable considerations, including whether the withdrawal of the student from public school was justified, whether the parent provided adequate notice, whether the amount of the private school tuition was reasonable, possible scholarships or other financial aid from the private school, and any fraud or collusion on the part of the parent or private school]; C.L., 744 F.3d at 840 [noting that "[i]mportant to the equitable consideration is whether the parents obstructed or were uncooperative in the school district's efforts to meet its obligations under the IDEA"]).

Reimbursement may be reduced or denied if parents do not provide notice of the unilateral placement either at the most recent CSE meeting prior to their removal of the student from public school, or by written notice ten business days before such removal, "that they were rejecting the placement proposed by the public agency to provide a [FAPE] to their child, including stating their concerns and their intent to enroll their child in a private school at public expense" (20 U.S.C. § 1412[a][10][C][iii][I]; see 34 CFR 300.148[d][1]). This statutory provision "serves the important purpose of giving the school system an opportunity, before the child is removed, to assemble a team, evaluate the child, devise an appropriate plan, and determine whether a [FAPE] can be provided in the public schools" (Greenland Sch. Dist. v. Amy N., 358 F.3d 150, 160 [1st Cir. 2004]). Although a reduction in reimbursement is discretionary, courts have upheld the denial

---

[9] The district did cite to the testimony from the parent which was about the contracts and the student's attendance (see Tr. pp. 254-65). Nothing in this testimony goes to whether the costs of the base tuition was excessive, and the parent testified that the student only missed school for doctor's appointments (id.).

11

of reimbursement in cases where it was shown that parents failed to comply with this statutory provision (Greenland, 358 F.3d at 160; Ms. M. v. Portland Sch. Comm., 360 F.3d 267 [1st Cir. 2004]; Berger v. Medina City Sch. Dist., 348 F.3d 513, 523-24 [6th Cir. 2003]; Rafferty v. Cranston Public Sch. Comm., 315 F.3d 21, 27 [1st Cir. 2002]); see Frank G., 459 F.3d at 376; Voluntown, 226 F.3d at 68).

### 1. Adverse Inference

Prior to reaching the merits of the equitable considerations dispute, I will first address the IHO's application of an adverse inference against the parent for iBrain's failure to respond to a subpoena (IHO Decision at pp. 17-18).

Unless specifically prohibited by regulations, IHOs are provided with broad discretion, subject to administrative and judicial review procedures, with how they conduct an impartial hearing, in order that they may "accord each party a meaningful opportunity" to exercise their rights during the impartial hearing (Letter to Anonymous, 23 IDELR 1073 [OSEP 1995]; see Impartial Due Process Hearing, 71 Fed. Reg. 46704 [Aug. 14, 2006]). An IHO must provide all parties with an opportunity to present evidence and testimony, including the opportunity to confront and cross-examine witnesses (34 CFR 300.512[a][2]; 8 NYCRR 200.5[j][3][xii]). Furthermore, each party "shall have up to one day to present its case" (8 NYCRR 200.5[j][3][xiii]). While an IHO is required to exclude evidence and may limit the testimony of witnesses that he or she "determines to be irrelevant, immaterial, unreliable or unduly repetitious" (8 NYCRR 200.5[j][3][xii][c]-[e]), it is also an IHO's responsibility to ensure that there is an adequate and complete hearing record (see 8 NYCRR 200.5[j][3][vii]). And an IHO has the authority to issue a subpoena if necessary (see 8 NYCRR 200.5[j][3][iv]).

In this instance, the IHO made an adverse inference against the parents based on iBrain's failure to respond to a subpoena and on the parents' decision not to present evidence to rebut the district's argument for which the district had requested the subpoenaed information (see IHO Decision at pp. 17-18). Initially, the IDEA does not "specify what particular remedies, including penalties or sanctions, are available to due process hearing officers or to decision makers in State-level appeals. The specific authority of hearing officers and appeal boards, including the types of sanctions that are available to them, generally will be set forth in State law or regulation" Letter to Armstrong, 28 IDELR 303 [OSEP 1997]. IHOs and SROs may nevertheless assert appropriate discretionary controls over the due process and review proceedings; however, in New York they have not been expressly granted contempt powers (Application of the Bd. of Educ., Appeal No. 02-056; Application of a Child with a Disability, Appeal No. 02-049). Additionally, at least one SRO has noted that adverse inferences may be drawn when private agencies, which contracted for services with the parents in the proceeding, failed to respond to subpoenas (Application of a Student with A Disability, Appeal No. 24-031 at n. 6).

Reviewing the IHO's adverse inference, the IHO noted that the testimony of the iBrain deputy director referred to information that could have been relevant to the district's assertion that iBrain controlled the parents' ability to obtain transportation and nursing services (IHO Decision at p. 18). The iBrain deputy director did, in fact, testify that iBrain had an internal document regarding what is discussed with parents at enrollment and that both nursing and transportation services were discussed at that time (Tr. pp. 137-41). After a request by the district, and argument

between the parties as to the relevance of the information being requested, the IHO signed a subpoena questing "[a]ny and all procedures manuals, written guidance, or Standard Operating Procedure Manuals which provide internal guidance to iBrain staff and/or parents concerning the provision of 1:1 nursing and transportation in use during the 2023-2024 School Year" (IHO Ex. VII; see IHO Ex. IX).  As determined by the IHO, the evidence subpoenaed by the district was in the parents' possession, or was at least in the possession of an entity that the parents were in contract with for delivery of services to the student.  In fact, the parents' contract with iBrain indicates an expectation that the parents would seek funding of the student's tuition from the district and that the parents were required to "cooperate fully in the process required to secure such funding" (Parent Ex. E at pp. 2-3, 4).  Accordingly, although iBrain was not a party to this proceeding, the IHO's finding of an adverse inference, based in part on the failure to comply with the subpoena, was within the IHO's discretion in conducting the hearing.[10]

Additionally, I note that the parents did not dispute that the information requested was, as the IHO held, "uniquely" in their possession nor did they assert that they could not obtain the information.  In fact, the parents do not dispute any of the specific findings made by the IHO that led to the adverse inference (see Req. for Rev. at ¶ 23).  Review of the IHO's decision shows that it was supported by evidence in the hearing record.  Notably, the IHO pointed to the iBrain director's testimony about the enrollment process and the requested internal document that iBrain used during that process (see IHO Decision at p. 18; see also Tr. pp. 137-38, 140-41).  Further, the parent testified that they obtained the information about the agencies from iBrain and communicated with iBrain about the services (Tr. pp. 240-43).  Therefore, the hearing record supports the IHO's decision for an adverse inference and there is insufficient reason to disturb this finding.

### 2. Credibility

The IHO reduced the parents' request for transportation funding by 50 percent and denied funding for nursing services finding that neither the parent nor the iBrain director were credible witnesses (IHO Decision at pp. 18-22).

Generally, an SRO gives due deference to the credibility findings of an IHO, unless non-testimonial evidence in the hearing record justifies a contrary conclusion or the hearing record, read in its entirety, compels a contrary conclusion (see Carlisle Area Sch. v. Scott P., 62 F.3d 520, 524, 528-29 [3d Cir. 1995]; P.G. v. City Sch. Dist. of New York, 2015 WL 787008, at *16 [S.D.N.Y. Feb. 25, 2015]; M.W. v. New York City Dep't of Educ., 869 F. Supp. 2d 320, 330 [E.D.N.Y. 2012], aff'd 725 F.3d 131 [2d Cir. 2013]; Bd. of Educ. of Hicksville Union Free Sch. Dist. v. Schaefer, 84 A.D.3d 795, 796 [2d Dep't 2011]; Application of a Student with a Disability, Appeal No. 12-076).

Here, there is nothing in the hearing record that compels a contrary credibility conclusion.  Specifically, the IHO correctly pointed to issues with the signature page on both contracts as neither was dated and, although they appeared to be electronically signed, neither had an e-verification (Parent Exs. F at p. 7; G at p. 8).  Further, the IHO pointed to issues with the parent's

---

[10] Although not part of my determinations on appeal, it is noted that the language used in the transportation contract and nursing contract was curiously similar (compare Parent Ex. F, with Parent Ex. G).

testimony, issues which were not contradicted by any documentary evidence. In general, the IHO was correct to find that the parent's testimony was vague and not helpful to establish that the parent actually signed the contracts (see Tr. pp. 235-243, 254-259).

Moreover, despite the parents' contention on appeal, the existence of a contract for services is not the only relevant inquiry to be considered when weighing equitable considerations. Equitable considerations may be reduced or denied based upon a finding of unreasonableness with respect to the actions taken by the parents (20 U.S.C. § 1412[a][10][C][iii]; 34 CFR 300.148[d]). A finder of fact does not have to accept a contract as a whole when weighing equitable factors, but may determine whether the actions taken by the party in entering into that contract were reasonable. Further, it is noted that the parents did not actually assert that the IHO erred in her credibility findings, instead they argue that the IHO acted outside of her authority by altering the terms of the contract.

Therefore, I find no reason to disturb the IHO's findings as to the credibility of the parent's testimony regarding the contracts for transportation and nursing services. Having upheld the IHO's adverse inference and credibility findings, the IHO's findings as to equitable considerations must be upheld. Accordingly, the IHO's award of the cost of 50 percent of the contracted for transportation services and denial of funding for nursing services is supported by the hearing record.

### 3. Excessiveness

I note that while I am upholding the IHO's determination to deny the parents' request for nursing services, based on the IHO's determination to deny funding on equitable grounds, I do not agree with the IHO's alternative finding that funding for 1:1 nursing services would have also been denied as being an excessive service and I will address that issue separately for the sake of thoroughness.

Generally, a student who needs school health services[11] or school nurse services[12] to receive a FAPE must be provided such services as indicated in the student's IEP (see School Health Services and School Nurse Services, 71 Fed. Reg. 46,574 [Aug. 14, 2006]; see also 34 CFR 300.34[a], [c][13]; 8 NYCRR 200.1[qq], [ss]; Cedar Rapids Community Sch. Dist. v. Garret, 526 U.S. 66, 79 [1999] [indicating that school districts must fund related services such as continuous one-on-one nursing services during the school day "in order to help guarantee that students . . . are integrated into the public schools"]). State guidance indicates that, in determining whether a student needs a 1:1 nurse, a CSE must obtain evaluative information in all areas of the student's disability or suspected disability; generally, it is expected that "[t]his information may include information from a physician, such as a written order to the school nurse from a student's health care provider" ("Guidelines for Determining a Student with a Disability's Need for a One-to-One Nurse," at p. 2, Office of Special Educ. Mem. [Jan. 2019], available at

---

[11] "School health services means health services provided by either a qualified school nurse or other qualified person that are designed to enable a student with a disability to receive a [FAPE] as described in the [IEP] of the student" (8 NYCRR 200.1[ss][1]).

[12] "School nurse services means services provided by a qualified school nurse pursuant to section 902(2)(b) of the Education Law that are designed to enable a student with a disability to receive a [FAPE] as described in the [IEP] of the student" (8 NYCRR 200.1[ss][2]).

https://www.nysed.gov/sites/default/files/programs/special-education/guidelines-for-determining-a-student-with-a-disability-need-for-a-1-1-nurse.pdf). In providing school nurse services, "the school remains responsible for the health and safety of the student and ensuring the care provided to the student is appropriate and done in accordance with healthcare provider orders" ("Guidelines for Determining a Student with a Disability's Need for a One-to-One Nurse," at p. 5). However, there is also State guidance indicating that "[i]f the CSE/CPSE determine that a student's health needs in accordance with provider orders for treatment can be appropriately met by the school's building nurse, a shared nurse, [or] a 1:1 aide to monitor and alert the school nurse, then a 1:1 nurse is not necessary" ("Provision of Nursing Services in School Settings - Including One-to-One Nursing Services to Students with Special Needs," at pp. 11-12, Office of Student Support Servs., [Jan. 2019], available at https://www.p12.nysed.gov/sss/documents/OnetoOneNSGQAFINAL1.7.19.pdf). To determine whether a student requires the support of a full-day, continuous 1:1 nurse, State guidance indicates the CSE "must weigh the factors of both the student's individual health needs and what specific school health and/or school nurse services are required to meet those needs" and provides the following set of factors to consider when making that determination:

- The complexity of the student's individual health needs and level of care needed during the school day to enable the student to attend school and benefit from special education;
- The qualifications required to meet the student's health needs;
- The student's proximity to a nurse;
- The building nurse's student case load; and,
- The extent and frequency the student would need the services of a nurse (e.g., portions of the school day or continuously throughout the day).

("Guidelines for Determining a Student with a Disability's Need for a One-to-One Nurse," at pp. 2-3).

Regarding excessiveness, among the factors that may warrant a reduction in tuition under equitable considerations is whether the frequency of the services or the rate for the services were excessive (see E.M., 758 F.3d at 461 [noting that whether the amount of the private school tuition was reasonable is one factor relevant to equitable considerations]). An IHO may consider evidence regarding whether the rate charged by the private agency was unreasonable or regarding any segregable costs charged by the private agency that exceed the level that the student required to receive a FAPE (see L.K. v. New York City Dep't of Educ., 2016 WL 899321, at *7 [S.D.N.Y. Mar. 1, 2016], aff'd in part, 674 Fed. App'x 100). More specifically, while parents are entitled to reimbursement for the cost of an appropriate private placement when a district has failed to offer their child a FAPE, it does not follow that they may take advantage of deficiencies in the district's offered placement to obtain all those services they might wish to provide for their child at the expense of the public fisc, as such results do not achieve the purpose of the IDEA. To the contrary, "[r]eimbursement merely requires [a district] to belatedly pay expenses that it should have paid all along and would have borne in the first instance" had it offered the student a FAPE (Burlington, 471 U.S. at 370-71 [emphasis added]; see 20 U.S.C. § 1412[a][10][C][ii]; 34 CFR 300.148). Accordingly, while a parent should not be denied reimbursement for an appropriate program due to the fact that the program provides benefits in addition to those required for the student to receive

15

educational benefits, a reduction from full reimbursement may be considered where a unilateral placement provides services beyond those required to address a student's educational needs (L.K., 674 Fed. App'x at 101; see C.B. v. Garden Grove Unified Sch. Dist., 635 F. 3d 1155, 1160 [9th Cir. 2011] [indicating that "[e]quity surely would permit a reduction from full reimbursement if [a unilateral private placement] provides too much (services beyond required educational needs), or if it provides some things that do not meet educational needs at all (such as purely recreational options), or if it is overpriced"]; Alamo Heights Indep. Sch. Dist. v. State Bd. of Educ., 790 F.2d 1153, 1161 [5th Cir. 1986] ["The Burlington rule is not so narrow as to permit reimbursement only when the [unilateral] placement chosen by the parent is found to be the exact proper placement required under the Act.  Conversely, when [the student] was at the [unilateral placement], he may have received more 'benefit' than the EAHCA [the predecessor statute to the IDEA] requires"]).

Although not in dispute on appeal a brief discussion of the student's needs is necessary to resolve the issue of whether the provision of 1:1 nursing services at iBrain was a necessary service or could be considered a service that was not necessary for the provision of a FAPE and that would have been segregable from the student's otherwise appropriate educational program.

Turning to the information available in the hearing record regarding the school year at issue, the 2023-24 school year, the student was found eligible for special education services by the April 2023 CSE as a student with a traumatic brain injury (Parent Ex. B at p. 1).  The student was described as being non-verbal, non-ambulatory and has been diagnosed with spastic quadriplegic cerebral palsy, microcephaly, Lennox-Gastaut Syndrome, and a cortical visual impairment (id. at p. 3).  According to the student's physician's medical accommodations form completed on June 21, 2023 and the April 2023 IEP, the student presented with multiple myoclonic seizures approximately two to three times per day occurring for less than 10 seconds (Parent Exs. B at p. 3; P at p. 6).

With regard to the effects of the student needs and involvement in general education curriculum, the IEP stated that due to physical, medical, learning, and communication needs the student required an intensive educational environment of a classroom with high adult to child ratio (id.).  In addition, the IEP noted that due to significant deficits in cognitive, adaptive, communication and physical development the student was precluded from participation in the general education program (id. at p. 22).  The IEP further noted that the student required a high degree of individual attention to meet daily care needs and therefore required "the support of a dedicated 1:1 paraprofessional" (id.).  According to the IEP, the student also benefited from intensive therapy and small group learning to meet the potential for development among peers in a classroom setting (id.).  Additionally, the student required a small, structured class within a specialized school setting along with various related services to make appropriate progress towards individualized goals within an alternate assessment program (id.).The April 2023 IEP indicated that the student was dependent for all activities of daily living (ADLs) and provided a detailed list of human, material, and environmental resources needed to address the student's management needs (id. at pp. 19-21).

The April 2023 iBrain plan was substantially incorporated into the district's April 2023 IEP (compare Parent Ex. B with Parent Ex. C).  The iBrain plan stated that the student required maximum assistance with dressing, grooming, and total assistance with managing fasteners, toileting, feeding, and transfers and was dependent on caregivers to navigate her environment

16

(Parent Ex. C at pp. 3-4). The student navigated her environment with the assistance of equipment such as a wheelchair, adaptive stroller, activity chair, gate trainer, supine stander, knee splits, AFO's and braces (id.). The student used an augmentative communication device (id.).

The iBrain education plan included a section for the student's health management, which specifically reported that the student required a "1:1 nurse and paraprofessional" and identified areas for nursing interventions as observing aspiration precaution, g-tube feeding, monitoring feeding and tolerance, referring and coordinating related services, toileting, checking skin and repositioning, toilet training, monitoring bowel movements, and monitoring seizure activity (Parent Ex. C at pp. 36-39). According to the iBrain plan, the student "require[d] the use of a 1:1 paraprofessional at all times…" and "require[d] a 1:1 nurse at all times to tend to her physical needs and ensure her medical safety, seizure management, and G-tube feed" (id. at p. 6).

The district's April 2023 IEP also included a section for the student's health management needs that reflected the student's need for school nursing service and 1:1 paraprofessional services, as well as similar needs as were reflected in the iBrain education plan(Parent Ex. B at pp. 20-22).

With respect to the student's need for 1:1 nursing services for the 2023-24 extended school year, the student's physician completed a medical accommodations request form on June 21, 2023, that indicated that the student was under his care for chronic seizures and Cerebral Palsy (Parent Ex. P at p. 1). The physician documented that the student presented with multiple episodes daily of Lennox-Gastaut seizures approximately two to three times per day occurring for less than 10 seconds (id. at pp. 6, 8). According to the physician's entries on the form, the student required emergency administration of medication for seizures lasting more than five minutes both in school and during transport (Parent Ex. P at pp. 3-4). The form further reflected the student's asthma diagnosis and use of an inhaler (id. at p. 2). The form stated that, at school, the student required nutrition provided via a g-tube twice a day at 10:00 a.m. and 2:00 p.m. and water provided via a g-tube twice a day at 7:00 a.m. and 12:30 p.m. (id. at pp. 4, 7). It also documented that the student needed ambulation assistance and an elevator pass during school and transport, and that continuous supervision/monitoring was required during transport (id. at pp. 4-5). The physician documented that the student was at risk for medical decompensation and needed to be monitored for prolonged seizure activity (id. at p. 5). The physician also signed a request for a 1:1 nurse indicating that the reason for the request was because the student was nonverbal and indicated the student's primary diagnoses were seizure disorder and cerebral palsy (id. at p. 9).

Both the April 2023 district IEP and the iBrain education plan included similar health management needs for the student (see Parent Exs. B; C).

The main difference between the iBrain education plan and the April 2023 IEP—which took most of its information from the iBrain education plan—was that in addressing the student's health management needs, while the iBrain education plan called for the use of 1:1 nursing services and 1:1 paraprofessional services, the April 2023 IEP recommended 1:1 paraprofessional services and school nursing services (compare Parent Ex. B at pp. 21, 32-33, 35-36, with Parent Ex. C at pp. 36-37, 52-54, 58). The prior written notice, dated September 21, 2023, noted that iBrain felt "the student require[d] the provision of a 1:1 nurse to address medical needs"; however, the prior written notice did not offer an explanation as to why 1:1 nursing services were not recommended for the student (Parent Ex. H).

17

In the parents' sworn affidavit, they stated "[b]ecause of [the student's] medical and health needs, [the student] also require[d] the assistance of a 1:1 nurse throughout the school day" (Parent Ex. K at ¶¶ 7, 8).  The parent also testified that he disagreed with the district's recommendation of a school nurse stating: "the school nurse is tending to more than one child.  She would be able to miss something that's happening to my child therefore hurting my child in the process. Whereas a one-to-one nurse will be able to see what's wrong with my child and assess the situation and fix it if she can" (Tr. p. 205).

In the iBrain deputy director's sworn affidavit, he stated that the student had a 1:1 nurse at all times to address her physical needs and ensure her medical safety, seizure management, and g-tube feedings (Parent Ex. L at ¶ 12).  Additionally, the deputy director testified that "I also disagreed with the lack of one-to-one nurse. As we know, [the student] is dependent on a one-to-one nurse to administer her seizure medications and also monitor her seizure-like disorders and then follow the seizure action plan as stipulated in her individual health plan" (Tr. p. 100).  He also testified that the "paraprofessional is not qualified" to monitor the student's seizures or implement the seizure action plan (Tr. pp. 144-45).

The physician's authorization form stated that the student needed "constant medical attention" and needed to be "monitor[ed] for prolonged seizure activity" (Parent Ex. P at pp. 1, 5). There is no evidence that either the district or iBrain followed applicable State guidance when making a determination as to whether the student required 1:1 nursing services ("Guidelines for Determining a Student with a Disability's Need for a One-to-One Nurse," at p. 3, Office of Special Educ. Mem. [Jan. 2019], available at https://www.nysed.gov/sites/default/files/programs/special-education/guidelines-for-determining-a-student-with-a-disability-need-for-a-1-1-nurse.pdf).  The State guidance specifically outlines that the student's individual health needs and level of care need to be considered: the qualification required to meet the student's health needs, the student's proximity to a nurse; the building nurse's student case load, and the extent and frequency the student would need the services of a nurse (id.).  In particular, during the hearing, the district did not present evidence, or even an argument, as to why 1:1 nursing services were excessive or that access to a school nurse would have been sufficient to meet the student's identified health needs.

Based on the above, although the hearing record is not clear that the student required the support of both 1:1 nursing services and 1:1 paraprofessional services, considering the physician's request for 1:1 nursing services, the recommendations contained within the iBrain education plan, and the district's adoption of the student's health needs from the iBrain education plan without an explanation as to why the district recommended school nursing services instead of 1:1 nursing services, the hearing record does not support the IHO's finding that 1:1 nursing services were excessive for this student.  Accordingly, if the IHO's excessiveness finding were the only basis for barring the requested relief for funding of nursing services, the parents would have been entitled to funding for nursing services.  However, as noted above, the IHO also denied funding for nursing services based on the reasonableness of the actions taken by the parents and that finding was upheld.

## VII. Conclusion

The IHO did not err in reducing the request for transportation funding by 50 percent nor did the IHO err by denying the request for funding for 1:1 nursing services on equitable grounds.

Additionally, as discussed above, equitable considerations did not warrant a reduction of or denial of funding for the costs of the student's tuition at iBrain. Accordingly, the IHO's May 2, 2024 decision is affirmed.

    **THE APPEAL IS DISMISSED.**

    **THE CROSS-APPEAL IS DISMISSED.**

**Dated:**    **Albany, New York**
            **August 15, 2024**                      _____
                                                                       **STEVEN KROLAK**
                                                                       **STATE REVIEW OFFICER**